UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | CASE NO.  3:08-mj-0030 CMK |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | JUDGMENT |
| Anthony J. Bator, | ) | |
| Defendant. | ) | |
| _____ | ) | |

This case came on regularly for trial on April 23, 2009,  at the United States District Court in Redding, California, the Honorable Craig M. Kellison, United States Magistrate Judge, presiding; the United States  appeared by and through Matthew Stegman, Assistant United States Attorney, and the defendant, Anthony J. Bator, appeared, in propria persona.

By way of violation notices F3807485 and F3807486, the defendant was originally charged with violating  36 C.F.R. 261.10(a),[1] "constructing . . . or maintaining any . . . road  . . .  without

_____

[1] 36 C.F.R. § 261.10

The following [is] prohibited:

(a) Constructing, placing, or maintaining any kind of road, trail, structure, fence, enclosure, communication equipment, significant surface disturbance, or other improvement on National Forest System lands or facilities without a special-use authorization, contract, or approved operating plan when such authorization is required.

. . . .

1 | . . . approved operating plan . . . ." and 36 C.F.R. 261.9(a)[2] "damaging any natural feature or other

2 | property of the United States."

3 |        On April 21, 2009, the United States filed a superceding information, again charging the

4 | defendant with violating § 261.10(a) in Count I; § 261.9(a) in Count II; and adding an additional

5 | charge in Count III for violating § 261.10(a) which relates to allegations of defendant's unauthorized

6 | snow plowing of  Forest Service roads.   Each of these offenses is punishable by fine of not more

7 | than $ 5,000, imprisonment for not more than six months, or both.[3]

8 |        At time of arraignment, the United States indicated that they would not seek incarceration

9 | following conviction on any of the existing counts.   This court then advised the defendant on the

10 | record that in the event of a finding of guilt as to any count of the Information it would not impose

11 | a sentence of imprisonment.  See, e.g., United States v. Ramirez, 555 F.Supp. 736 (E.D. Cal. 1983);

12 | United States v. Downin, 884 F.Supp. 1474 (E.D. Cal. 1995).[4]

13 |        On August 31, 2009, this court filed a proposed judgment [Doc. 6] wherein the court made

14 | various findings of fact and concluded that the defendant was guilty of violating 36 C.F.R. §

15 | 261.10(a), "constructing . . . any . . . road . . . without . . . approved operating plan . . . ." and §

16 |

17 |    [2]  36 C.F.R. § 261.9

18 | The following are prohibited:

19 | (a) Damaging any natural feature or other property of the United States.

20 | . . . .

21 |    [3]  36 C.F.R. 261.1b  provides that [a]ny violation of the prohibitions of this part (261) shall be punished by a fine of not more than $500 or imprisonment for not more than six months or both pursuant to title 16 U.S.C. , section 551, unless

22 | otherwise provided.  Part (261) prohibitions are defined as Class B misdemeanors  under 18 U.S.C.  3559(7);  and are classified as "petty offenses" pursuant to 18 U.S.C. 19.  Under 18 U.S.C. 3571(b)(6), the maximum fine was increased to $5,000.

23 |    [4]  Despite the fact that the defendant was not entitled to the appointment of counsel under Rule 58(b)(2)(C) of the Fed. R. Crim. P., the court became concerned that the defendant was possibly misdirecting his efforts in his defense to the outstanding

24 | charges.  On September 22, 2008 and January 5, 2009, he filed pleadings entitled "Special Appearance" and " Amended Special Appearance," respectively, essentially challenging the court's jurisdiction; "Special Appearance (3rd)" on January 5, 2009,

25 | consisting of 38 pages;  "Demand for Article III Judicial Officer" on April 21, 2009;  and "Petition for Hearing Regarding Issues of Law Which Need to be Clarified" on June 3, 2009, consisting of 76 pages.

26 |      Over defendant's objections, the court appointed him counsel on September 23, 2008.  Over the course of several court hearings, however, it became  apparent to the court that appointed counsel and the defendant were unable to work together as a

27 | result of defendant's insistence to represent himself throughout the course of the proceedings.  As a result, defendant's counsel, upon request, was relieved on December 12, 2008.

28 |

261.9(a) ,  "damaging any . . . property of the United States."  The court also concluded that the government failed to establish that defendant was required to have a POO for his snow removal activities under Count III, and accordingly indicated that it intended to find the defendant not guilty as to said Count..

The defendant was advised in the proposed judgment that as to Count I, that the court intended to impose a fine in the sum of $2,500.00, plus a $10.00 special assessment pursuant to 18 U.S.C. § 3013; and as to Count II, it's intention to impose a fine in the sum of $2,500.00, plus a $10.00 special assessment  pursuant to 18 U.S.C. § 3013, for total fine and assessments of $ 5,020.00.

 Pursuant to Rule 58(c)(3) of the F.R.Crim.P., the court continued the matter until  September 24, 2009,  to allow the defendant the opportunity to be heard in mitigation of the proposed sentence. On said date, the defendant appeared personally, and the United States appeared by and through Matthew Stegman, who appeared telephonically.   The defendant was heard in mitigation of sentence and the matter was argued and submitted.

The charges stem from the defendant's mining activities in Siskiyou County, California within the boundaries of the Klamath National Forest.  Defendant controls, or is the owner of, two patented mining claims, known as Trust  Busters Nos.1 and 2, in addition to a noncontiguous site known as the Trust Buster Mill Site.  Located between the Trust Buster claims and the Mill Site are two unpatented claims known as the Golden Rule and the Golden Rule Extension.  Although the defendant claims some type ownership to the Golden Rule claims, little evidence was received during trial to support this assertion.  The defendant testified that the Golden Rule claims were not perfected and the issue of ownership was "complicated."   Regardless of what interest the defendant has in the Golden Rule claims or whether said claims are valid,  they are located entirely on National Forest System lands.

As owner of the Trust Buster claims and the alleged owner of the Golden Rule claims, the defendant anticipated commencing limited mining operations in 2007.    In March 2007, the defendant contacted Donald  Hall [Hall], Acting District Ranger of the Klamath National Forest, seeking information concerning his desire to construct a road across Forest Service lands to his

3

proposed mining site located at the northern portion of the Golden Rule claim and on the southern portion of the Trust Buster No. 1 claim. Pursuant to this request, Hall and Forest Service employee, Curtis Hughes [Hughes], met with the defendant at the mining site on April 7, 2007. The purpose of the April visit was two-fold: (1) to allow the Forest Service an opportunity to assess the nature and extent of defendant's proposed mining operations, and (2) to evaluate defendant's request to utilize heavy equipment on a limited basis.

The three men walked the general area encompassing the claims, but focused primarily in an area located on the Golden Rule unpatented mining claim which defendant claims was the site of historical mining activity. Present at this site was a passage or tunnel to an existing mine or adit [Adit] which was intended to be the focal point of defendant's initial operations. The defendant was informed that he was not allowed to construct a road unless it was addressed in an approved plan of operations [POO].

The defendant anticipated the removal of enough ore from the site of the Adit that would lend itself to proper and adequate testing to determine if future mining would be profitable. To accomplish this, the defendant requested that he be allowed the limited use of a backhoe to extract the necessary samples. In order to get any type of heavy equipment to the Adit, however, it was necessary to drive the backhoe from the nearest access (Forest Service Road 48N05) which traversed the Golden Rule claim across National Forest System lands. Hall and Hughes were sympathetic to the defendant's request to a use a backhoe on a limited bases to extract the necessary samples, but only upon the condition that defendant "walk" [5] his backhoe from Road 48N05 across Forest Service lands to the Adit.

Several months passed, and the Forest Service became aware that a partial roadway [New Adit Road] had been constructed upon the Golden Rule claim in the general area of the Adit. On

---

[5] The term "walk" or "walking" the backhoe as described during trial apparently was meant to describe the least destructive method or manner of carefully moving the equipment from one location to the other. Hall testified that he and the defendant discussed the proposed path that the backhoe would take. The defendant denied that any specific path was agreed upon. The court need not decide which testimony to believe, since the partial roadway constructed greatly exceeded any level of construction or incidental disturbance contemplated by the parties.

July 5, 2008, Forest Service Law Enforcement Officer Jason Rasmussen [Rasmussen] visited the site and observed that a large swath of land in the Adit area had been disturbed and a significant amount of soil and vegetation had been removed.  The photographs received during trial depict the significant soil disturbance caused by the defendant's acts, and eliminate from consideration any argument that the defendant was simply repairing or improving an existing road.  (Exhs. 3a-3h, 4a-4o, 5b and 5c).  Counts I and II of the Information charge the defendant with this unauthorized road construction and damage to Forest Service property.

The charge in Count III of the Information stems from the defendant's alleged act of snow removal from Forest Service roads during the winter of 2008 without a POO.  Rasmussen testified that portions of the Forest Service roads in question were damaged as a result of poor blading. The defendant testified that he authorized the snow removal without seeking authorization from the Forest Service.  The snow removal was done by a third party at defendant's request over several miles of Forest Service roads from an area known as Gottville, near the Klamath River, to the defendant's mining site.

The defendant's testimony at trial did not refute his involvement in the Adit road construction or snow removal.  Instead, his defense appears to center on challenges to Forest Service authority and this court's jurisdiction.  Although, many of the issues raised by the defendant are oblique, he sets forth the following arguments in his Post Trial Brief.  (Doc. 21 ).

"1) What constitutes due process of law regarding the property interests of the defendant in this action?

2) Who owns the property allegedly damaged by the defendant?  The trees?  The vegetetive [sic]?  The ground?  What standing do they have to allege they have been damaged?

3) What right does the defendant have to ingress and egress from his property?

4) What jurisdiction does the forest service have over the property allegedly damaged by the defendant?

5) Who has jurisdiction over the future operations of the defendant?  (Doc. 21;  p. 2, lines 6-12).

. . .

[6]) Can the forest service deny the defendant ingress and egress from private property?

[7]) Can the forest service deny the defendant ingress and egress from an adit he owns on

1   mineral land he holds by a federal mining claim?

2        [8])  Can the forest service deny the defendant ingress and egress from an adit he holds as
3   a matter of ownership because of a tunnel right?

        [9])  Can the forest service arbitrarily, at their own discretion, close a road that has existed
4   on a mining claim for over 75 years?

5        [10])  Can the forest service  close a road at their discretion that has existed for over 75
6   years, and is the sole access to a privately held mineral patent?

        [11])  Is cutting timber or vegetetive [sic] grow [sic] on a road that has existed for 75 years
7   which is interfering with the defendant [sic] ability to access his property a crime?

8        [12])   Defendant is in possession of hard rock mineral lands held by valid federal mining
9   claim.  The vein out crops on the surface of the claim.  Trees and vegetetive [sic]  growth are
    growing out of the vein itself.  Does the miner have the right to cut this timber or vegetetive [sic]
10  growth which interferes directly with his mining of the vein?

11       [13])  Re: 7 - Can he be charged criminally if he cuts that timber and vegetetive [sic] growth
    without a permit?"  (Def's. Post Trial Brief , p. 4; lines 17-24; p. 5; lines 1-10).

12       In attempting to summarize these arguments; (a) claims 1 and 13 address concerns with this

13  court's jurisdiction;  (b) claims 2 through 13 appear to challenge the Forest Service's authority to

14  regulate mining activity and the defendant's conduct; and (c) claims 3 and 6 through 11 concern

15  issues of defendant's access to the defendant's mining site.[6]

16       In defendant's Post Trial Brief (Doc. 21) and Rebuttal Brief (Doc. 23), he does not address

17  the issue of snow removal set forth in Count III.

18                                  DISCUSSION

19  A.  Jurisdiction.

20       The defendant maintains  that he "has a right to mine.  His status as a sovereign citizen is

21  his authority." (Doc. 23; p. 3, lines 1-2).    In his earliest filings with the court, the defendant

22  continually stressed that "this court lacks jurisdiction over the subject matter, and jurisdiction over

23  the person."  (Docs. 2, 8, 9 and 13).  Rather than attempting to respond to defendant's apparent

24  general disdain to governmental control and regulation, the court will address his respective

25  challenges to this court's jurisdiction.  The defendant claims that he is being denied due process of

26

27  _____

28       [6]  Although several of the claims in (b) and (c) overlap, the issue of access is discussed in the context of defendant's
    alleged independent or appurtenant right of access, if any, to the Trust Buster claims.

                                        6

1  law by not being afforded a jury trial and the right to have this matter tried before an Article III

2  judge.

3        In the present case, the defendant is charged with three Class B misdemeanors.  18 U.S.C.

4  § 3559(a)(7).     Fed. R. Crim. P. 58(a)(2)[7] provides that in a case such as this "involving a petty

5  offense for which no sentence of imprisonment will be imposed, the court may follow any provision

6  of these rules that is not inconsistent with this rule and that the court considers appropriate."  A

7  "petty offense" is defined in 18 U.S.C. § 19 as "a Class B misdemeanor, a Class C misdemeanor, or

8  an infraction" for which the maximum fine is no greater than $5,000 in the case of an individual, and

9  no greater than $10,000 in the case of an organization. See, 18 U.S.C. § 3571(b)(6), (b)(7), (c)(6),

---

[7] As used herein, all reference to Rule or Rules refers to the Federal Rules of Criminal Procedure.

Federal Rules of Criminal Procedure, Rule 58.  Petty Offenses and Other Misdemeanors

(a) Scope.

(1) In General. These rules apply in petty offense and other misdemeanor cases and on appeal to a district judge in a case tried by a magistrate judge, unless this rule provides otherwise.

(2) Petty Offense Case Without Imprisonment. In a case involving a petty offense for which no sentence of imprisonment will be imposed, the court may follow any provision of these rules that is not inconsistent with this rule and that the court considers appropriate.

(3) Definition. As used in this rule, the term "petty offense for which no sentence of imprisonment will be imposed" means a petty offense for which the court determines that, in the event of conviction, no sentence of imprisonment will be imposed.

(b) Pretrial Procedure.

(1) Charging Document. The trial of a misdemeanor may proceed on an indictment, information, or complaint. The trial of a petty offense may also proceed on a citation or violation notice.

(2) Initial Appearance.  At the defendant's initial appearance on a petty offense or other misdemeanor charge, the  magistrate judge must inform the defendant of the following:

(A) the charge, and the minimum and maximum penalties, including imprisonment, fines, any special assessment under 18 U.S.C. § 3013, and restitution under 18 U.S.C. § 3556;

(B) the right to retain counsel;

(C) the right to request the appointment of counsel if the defendant is unable to retain counsel--unless the charge is a petty offense for which the appointment of counsel is not required;

(D) the defendant's right not to make a statement, and that any statement made may be used against the defendant;

*(E) the right to trial, judgment, and sentencing before a district judge--unless:*

*(i) the charge is a petty offense; or*

(ii) the defendant consents to trial, judgment, and sentencing before a magistrate judge;

*(F) the right to a jury trial before either a magistrate judge or a district judge--unless the charge is a petty offense; and*

(G) any right to a preliminary hearing under Rule 5.1, and the general circumstances, if any, under which the defendant may secure pretrial release.

(3) Arraignment.

(A) Plea Before a Magistrate Judge. A magistrate judge may take the defendant's plea in a petty offense case. In every other misdemeanor case, a magistrate judge may take the plea only if the defendant consents either in writing or on the record to be tried before a magistrate judge and specifically waives trial before a district judge. The defendant may plead not guilty, guilty, or (with the consent of the magistrate judge) nolo contendere.

*(B) Failure to Consent. Except in a petty offense case, the magistrate judge must order a defendant who does not consent to trial before a magistrate judge to appear before a district judge for further proceedings.* [emphasis added].

. . . .

1    (c)(7).  18 U.S.C. § 3401(b)[8] provides that when the offense charged is a petty offense, as in the case

2 of a Class B misdemeanor, no consent is required for the matter to be tried by a magistrate judge.

3 § 3401(b) and Rule 58(b)(2)(F).   As such, jurisdiction by this court over the defendant is proper.

4      The defendant next suggests that despite the authority provided by Congress and decisional

5 law, the trial of these matters before a magistrate judge is unconstitutional.  The defendant provides

6 no authority to support this general challenge.

7      In 1996 Congress enacted amendments to § 3401 which allowed magistrate judges to try

8 persons accused of an infraction, Class C misdemeanor or Class B misdemeanor involving a motor

9 vehicle offense, without the defendant's consent.  Thereafter, a constitutional challenge was brought

10 contending § 3401 was unconstitutional as it eliminated the requirement that a defendant consent to

11 be tried before a magistrate judge. See <u>United States v. McCrickard</u>, 957 F. Supp. 1149 (E.D.

12 Cal.1996).  Following an extensive analysis, the court in *McCrickard* concluded that amendments

13 to § 3401 were constitutional given the historical evidence that the Framers distinguished between

14 the constitutional rights of defendants charged with felonies and petty offenses. Id. at 1155.

15 Moreover, the court looked to the Congress' capacity to confer jurisdiction on a magistrate judge to

16 try petty offenses.  Id. at 1155-56.   Finally, the court took into consideration that Congress was

17 aware of the constitutional issues posed by the 1996 amendment and resolved the same by reference

18 to Supreme Court precedent and historical practices.  Id. at 1156.

19

20     [8]  As used herein, all references to § 3401 refer to 18 U.S.C  § 3401.

21

22     18 U.S.C.A. § 3401

23 (a) When specially designated to exercise such jurisdiction by the district court or courts he serves, any United States magistrate judge shall have jurisdiction to try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district.

24 *(b) Any person charged with a misdemeanor, other than a petty offense may elect, however, to be tried before a district judge for

25 the district in which the offense was committed.* The magistrate judge shall carefully explain to the defendant that he has a right to trial, judgment, and sentencing by a district judge and that he may have a right to trial by jury before a district judge or

26 magistrate judge. The magistrate judge may not proceed to try the case unless the defendant, after such explanation, expressly consents to be tried before the magistrate judge and expressly and specifically waives trial, judgment, and sentencing by a district

27 judge. Any such consent and waiver shall be made in writing or orally on the record. [emphasis added].
 . . . .

28

8

1    The 2000 amendments to § 3401 were similar to the 1996 amendments. As with the 1996

2    amendments, the 2000 amendments also eliminated the need for consent, but expanded the scope

3    to all petty offenses which would encompass in the present case the Class B misdemeanor charges

4    against the defendant. Cong.Rec. S10844-03, S10847-03.   The court finds that the analysis

5    employed in *McCrickard* is also applicable to the 2000 amendments.

6    The defendant next argues that he has a right to trial by jury.  The Supreme Court has held

7    otherwise. A criminal offense providing for a maximum prison term of six months or less is

8    presumptively petty, and in such cases a defendant is not entitled to a jury trial unless additional

9    statutory penalties, viewed in conjunction with the authorized prison term, are so severe that they

10   reflect a legislative determination that the offense is "serious." Blanton v. City of North Las Vegas,

11   489 U.S. 538, 543, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989).  Such situations are extremely rare, and

12   are not applicable to the potential penalties against the defendant in the present case.  See Lewis v.

13   United States, 518 U.S. 322, 327, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996).  The fact that the three

14   charges against the defendant could have an aggregate prison term exceeding six months, does not

15   trigger a right to a jury trial.  Id. at 330.

16   B.  Authority of the Forest Service to Regulate Mining Activities.

17   The Defendant contends that the Forest Service has no authority to interfere with his mining

18   operations.  Defendant insists that as a miner, he possesses the right to build or maintain access to

19   and from his mine site across Forest Service lands without Forest Service interference.  Of course,

20   this position contradicts his initial motivation in meeting with Hall and Hughes when seeking Forest

21   Service permission to construct a road and move heavy equipment to his mining site.

22   Absent a finding that the defendant's presence on National Forest System lands was in

23   furtherance of his mining activities, it is clear to the court that the defendant's act of construction

24   of the New Adit Road (or simply improving an existing road as defendant maintains) which resulted

25   in  significant soil  disturbance and surface damage satisfies the elements of § 261.10(a) which

26   prohibits the construction of roads upon National Forest System lands without a POO; and §

27   261.9(a) which prohibits damaging property of the United States.

28

1    Whether the defendant's status as a "miner" exempts or removes him from § 261[9] liability

2    requires a brief review of the authority of the Forest Service with respect to mining operations on

3    National Forest System lands.

4    Mining operations are defined in part by 30 U.S.C. § 612, and more specifically in § 228.3.

5    Section 228.3 defines "operations" as follows:

6
7        "All functions, work, and activities in connection with prospecting, exploration,
         development, mining or processing of mineral resources and all uses reasonably
         incident thereto, including roads and other means of access on lands subject to the
8        regulations in this part, regardless of whether said operations take place on or off
         mining claims."
9

10   The Forest Service may properly regulate the surface use of forest lands.  While the

11   regulation of mining per se is not within Forest Service jurisdiction, where mining activity disturbs

12   National Forest System lands, Forest Service regulation is proper.  United States v. Weiss, 642 F.2d

13   296, 298 (9th Cir. 1981) (Secretary of Agriculture has "power to adopt reasonable rules and

14   regulations regarding mining operations within the national forests");  United States v. Richardson,

15   599 F.2d 290 (9th Cir.1979), cert. denied, 444 U.S. 1014[, 100 S.Ct. 663, 62 L.Ed.2d 643] (1980)

16   (recognizing the conflict between mining and forest land policies and holding that the district court

17   may properly enjoin unreasonable destruction of surface resources).   United States v. Goldfield

18   Deep Mines Co., 644 F.2d 1307, 1309 (9th Cir. 1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1252,

19   71 L.Ed.2d 445 (1982); United States v. Doremus, 888 F.2d 630, 632 (9th Cir.1989), cert. denied,

20   498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 772 (1991) [Doremus].   In reaffirming the Forest

21

22   ─────────────────
        [9] As used herein, all references to section or § refer to Title 36 of the Code of Federal Regulations.
23
          36 C.F.R. § 261.1 Scope.
24   (a) The prohibitions in this part apply, except as otherwise provided, when:
     (1) An act or omission occurs in the National Forest System or on a National Forest System road or trail.
25   (2) An act or omission affects, threatens, or endangers property of the United States administered by the Forest Service.
     (3) An act or omission affects, threatens, or endangers a person using, or engaged in the protection, improvement or
26   administration of the National Forest System or a National Forest System road or trail.
     (4) An act or omission occurs within the designated boundaries of a component of the National Wild and Scenic Rivers System.
27   (b) Nothing in this part shall preclude activities as authorized by the Wilderness Act of 1964 or the U.S. Mining Laws Act of
     1872 as amended.
28   (c) Unless an offense set out in this part specifies that intent is required, intent is not an element of any offense under this part.
     (d) None of these prohibitions apply to any person engaged in fire suppression actions.

1    Service's authority to regulate mining, the court in *Doremus*, supra at 632,  rejected a miner's

2    contention that conduct "reasonably incident[al]" to mining could not be so regulated, and left no

3    doubt that the Department of Agriculture possesses statutory authority to regulate activities related

4    to mining in order to preserve the national forests. 16 U.S.C. § 551.

5            The court in *Doremus*  rejected many of the arguments continually raised by the defendant

6    in the present case challenging Forest Service regulation.  *Doremus* clearly supports the use of § 261

7    prohibitions against miners so long as the mining operations are not "unreasonably circumscribed

8    as to amount to a prohibition."  See also,  United States v. Weiss, supra at 299.  The court in

9    *Doremus* also found that the § 261 prohibitions do not conflict with 30 U.S.C. § 612 because the

10   regulatory right of the Forest Service does not "endanger or materially interfere with mining

11   operations."  Id. at 632.

12           Here, the defendant is charged with constructing a road and damaging Forest Service property

13   without Forest Service permission.   Prohibiting this type of conduct does not interfere in any way

14   with defendant's mining operations.   The defendant was granted oral permission from Hall and

15   Hughes to carefully move a backhoe to his mine site for limited sampling.   His initial request to

16   construct a road was denied until he obtained an approved POO.   In mining operations, the use of

17   any type of heavy equipment without permission from the Forest Service is problematic in that such

18   use of equipment *may* result in a "significant disturbance of [Forest Service] resources" requiring

19   the prior submission of a Notice of Intent [NOI] or, possibly a POO under § 228.4.[10]

20

21           [10]  36 C.F.R. § 228.4 Plan of operations--notice of intent--requirements.

22   (a) Except as provided in paragraph (a)(1) of this section, a notice of intent to operate is required from any person proposing to
     conduct operations which *might cause significant disturbance of surface resources*. Such notice of intent to operate shall be
     submitted to the District Ranger having jurisdiction over the area in which the operations will be conducted. Each notice of intent

23   to operate shall provide information sufficient to identify the area involved, the nature of the proposed operations, the route of
     access to the area of operations, and the method of transport.

24
     (1) A notice of intent to operate is not required for:

25   (i) Operations which will be limited to the use of vehicles on existing public roads or roads used and maintained for National
     Forest System purposes;

26   *(ii) Prospecting and sampling which will not cause significant surface resource disturbance and will not involve removal of
     more than a reasonable amount of mineral deposit for analysis and study which generally might include searching for and

27   occasionally removing small mineral samples or specimens, gold panning, metal detecting, non-motorized hand sluicing, using
     battery operated dry washers, and collecting of mineral specimens using hand tools;*
     (iii) Marking and monumenting a mining claim;

28   (iv) Underground operations which will not cause significant surface resource disturbance;

1    When the potential for "significant disturbance" of Forest Service lands arises, the mining

2   operator is required to jump through several costly and time-consuming hoops before commencing

3   operations.  To identify these concerns, the operator is required to submit a NOI to the District

4   Ranger who will assess the operator's proposed mining operations. § 228.4(a).  If the Forest Service

5   determines that the proposed operations "will likely cause a significant disturbance of surface

6   resources," the operator is required to submit a proposed POO to address the impact upon Forest

7   Service lands. § 228.4(a)(2) and (3).  Once a POO is required, the operator's costs rise exponentially.

8   _____

9   *(v) Operations, which in their totality, will not cause surface resource disturbance which is substantially different than that caused*

10  *by other users of the National Forest System who are not required to obtain a Forest Service special use authorization, contract, or other written authorization;*

11  *(vi) Operations which will not involve the use of mechanized earthmoving equipment, such as bulldozers or backhoes, or the cutting of trees, unless those operations otherwise might cause a significant disturbance of surface resources; or*

12  (vii) Operations for which a proposed plan of operations is submitted for approval;
. . .

13  (3) An operator shall submit a proposed plan of operations to the District Ranger having jurisdiction over the area in which operations will be conducted in lieu of a notice of intent to operate if the proposed operations *will likely cause a significant*

14  *disturbance of surface resources.* An operator also shall submit a proposed plan of operations, or a proposed supplemental plan of operations consistent with § 228.4(d), to the District Ranger having jurisdiction over the area in which operations are being

15  conducted if those operations are causing a significant disturbance of surface resources but are not covered by a current approved plan of operations. The requirement to submit a plan of operations shall not apply to the operations listed in paragraphs (a)(1)(i)

16  through (v). The requirement to submit a plan of operations also shall not apply to operations which will not involve the use of mechanized earthmoving equipment, such as bulldozers or backhoes, or the cutting of trees, unless those operations otherwise will likely cause a significant disturbance of surface resources.

17
18  (4) If the District Ranger determines that any operation is causing or will likely cause significant disturbance of surface resources, the District Ranger shall notify the operator that the operator must submit a proposed plan of operations for approval and that the operations can not be conducted until a plan of operations is approved.

19  . . .

20  *(c) The plan of operations shall include:*
*(1) The name and legal mailing address of the operators (and claimants if they are not the operators) and their lessees, assigns, or designees.*

21  *(2) A map or sketch showing information sufficient to locate the proposed area of operations on the ground, existing and/or proposed roads or access routes to be used in connection with the operations as set forth in § 228.12 and the approximate*

22  *location and size of areas where surface resources will be disturbed.*
*(3) Information sufficient to describe or identify the type of operations proposed and how they would be conducted, the type and*

23  *standard of existing and proposed roads or access routes, the means of transportation used or to be used as set forth in § 228.12, the period during which the proposed activity will take place, and measures to be taken to meet the requirements for*

24  *environmental protection in § 228.8.*
. . .

25  (f) Upon completion of an environmental analysis in connection with each proposed operating plan, the authorized officer will determine whether an environmental statement is required. Not every plan of operations, supplemental plan or modification will

26  involve the preparation of an environmental statement. Environmental impacts will vary substantially depending on whether the nature of operations is prospecting, exploration, development, or processing, and on the scope of operations (such as size of

27  operations, construction required, length of operations and equipment required), resulting in varying degrees of disturbance to vegetative resources, soil, water, air, or wildlife. The Forest Service will prepare any environmental statements that may be required.

28  . . . .   [emphasis added]

An "environmental assessment" may then become necessary [§§ 228.4(f) and 228.8], and possibly the need to post a reclamation bond (§§ 228.8(g) and 228.13).  Hall and Hughes discussed these concerns with the defendant during their first meeting at the mine site.

Understandably, in order for a miner to determine if his anticipated mining operations requires an approved POO, limited use of heavy equipment to conduct sampling may prove necessary.  Section 228.12[11] contemplates obtaining written permission from the Forest Service in these types of situations.  As a result, the use of heavy equipment (even on a limited basis) to extract sample ore may prove cost prohibitive because of the NOI or POO requirements under §§ 228.4 and 228.12.  Predictably, any upstart miner would wish to avoid this bureaucratic mire and expense.

With these hurdles present, the defendant sought only limited permission to utilize heavy equipment to access his mining sight to extract samples.  The defendant believed that a backhoe was necessary to extract meaningful ore samples to determine if future mining operations at the site was financially feasible.  Following this determination, the defendant would then be in a position to predict the nature and extent, if any, of his future mining operations.  If the use of heavy equipment or the potential for significant surface disturbance existed, it would trigger the necessity for defendant to submit NOI and possibly a POO.

Hall and Hughes were initially sympathetic to the defendant's request to utilize a backhoe on a limited bases without first submitting a NOI or POO, and  agreed to allow defendant to "walk" his backhoe from a Road 48N05 across Forest Service lands to the Adit.  The defendant agreed to these conditions.

---

[11]   36 C.F.R. § 228.12 Access.

*An operator is entitled to access in connection with operations*, *but* no road, trail, bridge, landing area for aircraft, or the like, shall be constructed or improved, *nor shall any other means of access, including but not limited to off-road vehicles, be used until the operator has received approval of an operating plan in writing from the authorized officer when required by § 228.4(a).* Proposals for construction, improvement or use of such access as part of a plan of operations shall include a description of the type and standard of the proposed means of access, a map showing the proposed route of access, and a description of the means of transportation to be used. Approval of the means of such access as part of a plan of operations shall specify the location of the access route, design standards, means of transportation, and other conditions reasonably necessary to protect the environment and forest surface resources, including measures to protect scenic values and to insure against erosion and water or air pollution.  [emphasis added].

1    What occurred in the ensuing months, however, was not the type of innocuous use of heavy

2  equipment envisioned by Hall and Hughes.  The defendant did not "walk" the backhoe up in the area

3  contemplated by Hall and Hughes, but instead caused significant surface disturbance by beginning

4  the construction of a road in a nearby location.  The defendant's activities resulted in substantial soil

5  disturbance in the area that the road was carved from the existing slope, thus increasing the risk for

6  future erosion.  Much of the vegetation in the area was either destroyed or irreparably damaged.

7    Defendant next argues that even if his road construction exceeded the scope of his

8  understanding with Hall and Hughes, it was constructed  by a third party  acquaintance by the name

9  of Lee Clark [Clark] without his permission or authorization.  Although the defendant admits that

10  he discussed with Clark the general need for a road to the Adit, he claims that Clark gratuitously

11  undertook the project without his permission.  The court finds this version unlikely and self-serving.

12  Clark  was an acquaintance of the defendant and was allowed to live at the mill site.  He  performed

13  work for the defendant at the mining site and was allowed to use the defendant's heavy equipment.

14  The court finds ambiguous defendant's efforts during trial to distance himself from Clark while at

15  the  same  time  claiming  full  responsibility  for  the  road's  construction.  See, 18 U.S.C. § 2(b)

16  ("[w]hoever willfully causes an act to be done which if directly performed by him or another would

17  be an offense against the United States, is punishable as a principal.").  <u>United States v</u>. <u>Valencia</u>,

18  492 F.2d1071 (9th Cir. 1974).   Similarly, it is not a defense that defendant was unaware of Clark's

19  actions.  As with virtually all Forest Service violations, there is no *mens rea* element contained in

20  this  regulation. 36 C.F.R.  261.1(c); <u>United  States v. Wilson</u>, 438 F.2d 525 (9th Cir.1971)

21  (interpreting a Title 36 C.F.R. violation).  The criminal law does not generally require that the

22  government prove that the defendant knew of the law or activity rendering his acts criminal.  Model

23  Penal Code § 2.04(1) (2009).  Thus the familiar maxim, ignorance or mistake of the law is no

24  defense is applicable here. See  <u>United States v. O'Mara</u>, 963 F.2d 1288 (9th Cir. 1992).  The court

25  concludes that the defendant is legally responsible for the acts of Clark.

26  <u>Repair of Existing Road.</u>

27    Although, the defendant claims that a road [Old Adit Road] to the Adit was already in

28  existence, the court received little, or no evidence to support this assertion, and the aerial

14

1    photographs certainly belie this claim.[12]

2         Even if the court was persuaded that some form of road leading to the Adit existed, the

3    nature and scope of the improvement necessary to place the road in any type of usable condition to

4    allow the passage of heavy equipment would certainly have required the defendant to obtain

5    permission from the Forest Service by the submission of a NOI or POO.  § 228.4(a).   When Hall

6    and Hughes first met with the defendant, he was informed that he would not be allowed to construct

7    any type of road to his mine unless he first obtained an approved POO.  If the court were to believe

8    the testimony of Hall and Hughes that no road existed, then certainly the need for an approved POO

9    would have been required to construct an access to the Adit.  If the defendant's testimony is to be

10   believed, a NOI or POO would still have been required because of the extensive road improvement

11   necessary to allow the passage of heavy equipment. It matters little to the court whether the

12   "significant disturbance" was caused by the building of a new road, or as a result of repairing or

13   improving an existing road.  The damage is the same, and is subject to § 261 enforcement under

14   *Doremus*.

15   _____

16       [12]  One of defendant's central claims involves the fact that the Old Adit Road has existed for a considerable  period of

17   time, and that the alleged unauthorized work or damage that is the subject matter of this action,  simply relates to his efforts to
     repair or reopen the existing road.  This claim contradicts the testimony of both Hall and Hughes who testified that no such road
     to the Adit ever existed.  Hughes testified that what defendant perceived to be an existing road was only a logging spur [Logging

18   Spur] which had not been used since the early 1980's.  Similarly, Hughes testified that the area where the defendant constructed
     the New Adit Road was in a different location from the  Logging Spur.  It is unclear whether the defendant maintains that the
     Logging Spur and Old Adit Road are one and the same.

19       At close of trial, the court offered both sides the opportunity to submit historical aerial photographs that could shed
     light on their respective positions. The defendant welcomed this opportunity.   The United States submitted several photographs

20   that failed to depict the existence of any road near the Adit.  The defendant submitted one photograph which also failed to depict
     the existence of any road in the area of the Adit.  The defendant maintains that the Old Adit Road cannot be seen because the
     resolution on all of the photographs is poor.  Of course, this argument runs counter to defendant's claim that the  Old Adit Road

21   would have been obvious to anyone concerned.  The defendant also submitted a map dated 1932 [Exhibit PTB#1] and a
     surveyor's  map dated 1969 [Exhibit PTB #2] which offer little to support the existence of the claimed Old Adit Road.  Although

22   these maps depict a roadway in the general area between the Trustbuster No. I claim and the mill site, they fall far short of being
     the "smoking gun" to support the existence of any road that defendant claims existed.

23        Following receipt of the aerial photographs received post-trial from the United States, the defendant objected to their
     consideration by the court since he did not have the opportunity to cross examine or question their authenticity.  This objection,

24   however, is slightly disingenuous.  At the conclusion of trial, both the defendant and counsel for the government  stipulated that
     each side  would be allowed an opportunity to submit historical aerial photographs should they desire.  Certainly, if the
     photographs had proved favorable, the defendant would be the first to argue their evidentiary significance.  The fact that they

25   now prove otherwise, or at best, inconclusive, the defendant now finds it convenient  to object to their introduction.

26       What must now occur is that the maps and photographs introduced by both parties post-trial will not be received or
     considered by the court.  At best, these exhibits support the existence of some type of road that was used in years past.  With the

27   exclusion of these post-trial exhibits, the court is simply left  with the testimony of Hall and Hughes who testified that no road to
     the Adit existed, and testimony to the contrary from the defendant.  Since the defendant had no right to make or construct a new

28   road, or significantly improve an old road, without an approved PO, the distinction is of no consequence.

C.  Snow Removal.

In the winter of 2008, the defendant authorized the snow plowing of Forest Service roads between Gottville, located near the Klamath River to his mining site.   The defendant admitted that the work was done at his request without first obtaining permission from the Forest Service.   The defendant's snow plowing methods caused damage to several areas of the roads in question.   Instead of following traditional methods of snow plowing and leaving several inches of snow on the road, the defendant's agent scraped the road's surface resulting in damage.

Here, the snow removal by the defendant was done for purposes of traveling to and from his mine.[13]   The government argues that the defendant was required under § 228.4(a) to submit a NOI and possibly a POO to snow plow the roads in question because the act of snow plowing with mechanized equipment   "might cause significant disturbance of surface resources."  Id.  This argument is obviously bolstered by the reality of the damage that actually occurred.[14]

The court does not agree.   Seasonal  snow plowing is a routine seasonal activity on many National Forest System roads.  Although the potential for causing damage exists, it is hard to classify the potential as great, or that the damage, if any, would be significant.   The court does not envision that routine snow plowing would generally, or even likely, result in "significant disturbance of surface resources."   Similarly, the evidence received at trial does not support the conclusion that the snow plowing damage caused by the defendant was  "significant."

_____

[13]  The roads utilized in the present case, however, were general Forest Service roads not used exclusively by the defendant. These roads traverse National Forest System lands for many miles before leading to the access to defendant's mining site.  If the defendant's use of these roads is considered in the context of his mining operations, he is subject to the "significant disturbance" threshold before needing Forest Service approval to perform snow removal. § 228.4(a).  If the use can be construed as simply collateral or incidental to  mining operations, then special use authorization may be required under the less  stringent § 251.50. (Special use authorization not required if the use of  National Forest System is nominal. § 251.50(e)(1)).  Here, defendant's use of these roads should be subject to the special use provisions set forth in § 251.50.  The evidence at trial indicated that he allowed his mining site to be used as a residence by a third party, which supports the argument that the Mill Site may not have been used exclusively for mining purposes. The defendant should not be allowed to use the "mining card" to avoid Forest Service oversight regarding the use of these Forest System roads.  This can be addressed preferably in a POO, or alternatively by way of special use authorization.

[14]  The Forest Service is not without future remedy.  Doremus allows "resource damage" prosecution under § 261.9(a), and injunctive relief and damages can certainly be pursued  civilly.  See, United States v. Nogueira, 403 F.2d 816 (9th Cir. 1968);  United States v. Langley, 587 F. Supp. 1258 (E.D. Cal. 1984).

The elements of § 261.10(a) require the government prove that the defendant "maintain[ed] any. . . road . . . without . . . approved operating plan . . . ."  Conceding that snow plowing is tantamount to road maintenance, the question remaining is whether the defendant was required to obtain a POO under § 228.4(a)(3) to snow plow.

The court is also unable to arrive at this conclusion.  Since routine snow plowing arguably would not "likely cause a significant disturbance of surface resources" under § 228.4(a), the defendant in the present case was under no obligation to initially submit a NOI.  By not submitting a NOI, the District Ranger was never placed in a position to request the submission of a POO addressing the issue of snow removal. § 228.4(a)(3).  Of course, when differing opinions exist between the District Ranger and the operator concerning the likelihood of "significant disturbance" of surface resources, " the District Ranger's opinion can trump that of the operator and a POO can be required. § 228.4(4).

In the present case, this latter scenario never arose, because the defendant most likely would not have anticipated that his routine snow removal might or would cause "significant disturbance."  Although the Forest Service notified the defendant in writing in August 2008, to obtain a POO if he desired to continue his mining operations, the notification did not address the concerns of snow removal.  (Ex. 2).[15]

For these reasons, the court cannot conclude that the defendant was required to obtain an approved POO addressing the issue of snow removal, and finds him not guilty of Count III.

## CONCLUSION

The court concludes that the defendant was required to obtain an approved POO before constructing or improving any road leading to his mine site.  In failing to do so, he violated § 261.10(a), "constructing . . . any . . . road . . . without . . . approved operating plan . . . ." and § 261.9(a), "damaging any . . . property of the United States."  The government has failed to

[15] The court is sympathetic to the government's argument that because defendant's Adit road construction required an approved POO, the issue of snow removal would have been a topic addressed therein.  To assume, however, that the defendant or the Forest Service would have anticipated or discussed the inclusion of snow removal activities in any POO is speculative.

1   establish that defendant was required to have a POO for his snow removal activities under Count III.

2          For the reasons set forth, the court finds that the defendant is guilty of Counts I and II, and

3   not guilty as to Count III.

4          Accordingly,

5          Pursuant to the Sentencing Reform Act, it is the judgment and sentence of this court that:

6          (1) As to Count I, the defendant is ordered to pay a fine in the sum of $ 2,500.00, plus a

7   $ 10.00 special assessment pursuant to 18 U.S.C. § 3013;

8          (2) As to Count II, the defendant is ordered to pay a fine in the sum of $ 2,500.00, plus a

9   $ 10.00 special assessment  pursuant to 18 U.S.C. § 3013, for a total fine of $ 5,020.00.

10         Pursuant to Rule 58(g)(2)(13) and Rule 32(j) of the Federal Rules of Criminal Procedure, you

11  have the right to appeal the judgment of conviction and/or sentence to the United States District

12  Court within ten (10) days of the entry of this Judgment.  You must file your Notice of Appeal with

13  the Clerk of the United States District Court, Eastern District of California, 501 "I" Street,

14  Sacramento, California  95814.  You are further advised that if you are unable to pay the costs of

15  appeal, you may seek permission to appeal in forma pauperis.

17  DATED:  September 25, 2009

19  _____
    **CRAIG M. KELLISON**
    UNITED STATES MAGISTRATE JUDGE

18